UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARGARITA OJEDA o/b/o,                          NOT FOR PUBLICATION
GIOVANNI A. TORRES,                             **MEMORANDUM & ORDER**

           Plaintiff,

   -against-                                     06-CV-2483 (CBA)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

           Defendant.
-----------------------------------------------------------------X

AMON, United States District Judge:

Plaintiff Margarita Ojeda ("Ojeda") filed this action on behalf of her grandson, Giovanni

Torres ("claimant"), seeking review of an adverse decision by the Social Security Administration

denying his claim for benefits. Claimant filed his cross-motion for judgment on the pleadings,

and defendant opposed that motion and moved to remand. The Court entertained oral argument

on the motions on August 22, 2007. For the reasons set forth below, the decision of the Social

Security Administration is vacated and the case is remanded for further proceedings.

I.      **Background**

Claimant Giovanni A. Torres was born on June 2, 1986. (R. 80.) His parents are

separated, and he lives with his grandparents on Staten Island. (R. 97.) Although his mother

lives in the same building, claimant identifies his grandparents as his parents and considers his

mother to be more akin to a sibling. (R. 128, 155.) Claimant also has some contact with his

father, who lives in Brooklyn. (R. 128.)

Claimant has suffered from depression and anxiety since around 2001 when he was

attacked by other students in school.[1]  (R. 118, 120.)  Around that time he began sleeping in his grandparents' bed with them.  (R. 121.)  He then transferred to another nearby high school that his cousin was attending.  (R. 127.)  However, the events of September 11, 2001 occurred during the first week of school, and claimant subsequently became even more depressed and anxious.  (R. 121.)  Shortly thereafter, he withdrew from school and began receiving home instruction.  (R. 120, 123, 127.)  During the past several years claimant has been suffering from generalized anxiety disorder and has regularly received counseling for his anxiety and depression.  (R. 83-96, 118-22, 155-66, 226-265, 284.)  For instance, he received individualized therapy at Sunset Park Family Health Center for generalized anxiety disorder and school avoidant behavior from February 27, 2003 to July 31, 2003.  (R. 247-65.)  Then, he attended psychotherapy at the South Beach Psychiatric Center from September 5, 2003 until March 19, 2004.  (R.118-22, 156-66.)

Claimant has suffered several hardships that are symptomatic of, and/or result from, his condition.  For instance, he is extremely shy and cannot communicate or relate well with others, especially his peers.  (R. 87, 102, 109, 111, 129.)  He has a hard time making friends.  (R. 51, 87.)  He spends most of his time inside playing video games and watching television.  (R. 87, 101, 109.)  He often has trouble sleeping and has suffered from nightmares.  (R. 98, 104, 118, 128-29.)  He suffers anxiety attacks.  (R. 104.)  He has been unable to participate in physical activity and/or organized sports.  (R. 110.)  He has struggled throughout his childhood to get school work done.  (R. 113.)  And he has a fear of illness and dying.  (R. 128.)  He apparently also experienced audio and visual hallucinations in the form of "shadows."  (R. 258.)

---

[1]Elsewhere in the record it is indicated that this occurred in 2000.  (R. 118.)  In any event, the date of origin of claimant's anxiety disorder and other problems are of no consequence for present purposes.

In January of 2003, while on home instruction, claimant was evaluated to determine whether or not he needed a more appropriate individualized educational plan. (R. 123-25.) The Stanford-Binet Intelligence test was conducted, resulting in scores as follows: verbal reasoning - 64; abstract visual reasoning - 92; quantitative reasoning - 90; short-term memory - 82; test composite - 80. (R. 124.) The 64 in verbal reasoning indicates a score in the mildly deficient range and further indicates a significant weakness in this area. Id. However, the test composite score of 80 indicates an overall intelligence in the "low average" range. (R. 124, 136.) Later that month, claimant was evaluated by Carl Ciaccio on behalf of the school board. Mr. Ciaccio noted that there had been "ongoing deficiencies" in claimant's academic performance dating back to 1993. (R. 146.) Claimant was evaluated in several academic areas, and despite being over 15 years of age at the time, generally tested between the second and fourth grade levels in these areas. (R. 146-50.)

In September of 2003, when claimant began attending South Beach Psychiatric Center, he was evaluated by a Dr. Palmiery, who noted that claimant had experienced depression and anxiety since around 2000, but also noted that he spoke well and had no cognitive defects and that his memory, concentration, and attention were good. (R. 118.) Dr. Palmiery did find that he had a mood and anxiety disorder. (R. 119.)

Later that same month, claimant's teacher, Stanley Zazula, and a psychiatrist at the Seaview Academy High School, completed one of the Social Security Administration's teacher's questionnaires. (R. 189-96.) This questionnaire considered the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about

and manipulating objects, caring for oneself, and physical health and well-being.[2]  (R. 190-95.)

In the domain of acquiring and using information, claimant was determined to have an "obvious problem" with respect to comprehending oral instructions, comprehending and doing math problems, understanding and participating in class discussions, expressing ideas in written form, and learning new material.  He was found to have a "serious problem" with respect to understanding school and content vocabulary, reading and comprehending written material, recalling and applying previously learned material, and applying problem solving skills in class discussions.  He was determined to have a "very serious problem" with respect to providing organized oral explanations and adequate descriptions.  (R. 190.)  In the domain of interacting and relating with others, claimant was determined to have an "obvious problem" with respect to making and keeping friends, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, interpreting the meaning of facial expression, body language, hints, sarcasm, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation.  (R. 192.)

In September of 2003, claimant was evaluated pursuant to a Board of Education Individualized Education Plan.  (R. 171-82.)  Therein, he was subjected to the Woodcock Johnson III test, which found him to be performing from the mid-second to the mid-fifth grade levels in various math and reading and writing related areas.  (R. 173.)  Moreover, in the area of social and emotional performance, claimant demonstrated "significant interpersonal anxieties and poor social skills" which seriously interfered with his home instruction and required adult

_____

[2]As will be discussed below, these are the six domains analyzed by the Commissioner when determining whether or not an impairment functionally equals a listed impairment pursuant to the third step of the analysis determining whether or not a child is "disabled."

supervision.  (R. 175.)

Subsequently, in May of 2004, Dr. E. Charles, a physician hired by the Social Security Administration, evaluated claimant's case.  (R. 268.)  Dr. Charles noted that claimant had a learning disability, a mood disorder, and an anxiety disorder.  Id.  Dr. Charles evaluated claimant in the six domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and physical health and well-being.  (R. 270-71.)  He concluded that claimant has "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for oneself, and physical health and well-being and a "marked" limitation in only the area of interacting and relating with others.  Id.  In finding "less than marked" limitations in the acquiring and using information domain, Dr. Charles expressly considered the recurrent anxiety and mood disturbances, withdrawal from school and peers, limited academic success, and the Stanford-Binet composite score of 80.  (R. 270.)

In May of 2005, Skye Gold, Psy. D., who had treated claimant personally from February through August of 2003, reported that claimant had been receiving mental health treatment for several years due to generalized anxiety disorder.  (R. 284.)  He indicated that while claimant had taken medication in the past, that he was not taking medication at that time.  (R. 284.)  He further noted that claimant was still attending weekly individual therapy sessions geared to address his feelings of anxiety and improve his social skills.  (R. 284.)

Then, in August of 2005, Dr. James Sucich of the Sunset Terrace Family Health Center completed a psychiatric report regarding claimant.  (R. 275-79.)  He observed that claimant

suffered from generalized anxiety disorder, experienced heightened anxiety in social settings, and suffered from auditory and visual hallucinations.  Id.  Dr. Sucich also indicated that claimant's "Axis V Global Assessment of Functioning" score—which measures the clinician's judgment of the individual's overall level of functioning—was 55 out of 100, in the range which indicates moderate symptoms or moderate difficulty with social, occupational, or school functioning.  (Pl's Br. at 11 & n.3, Def's Br. at 7 & n.4-5.)  Dr. Sucich also felt that claimant has a "marked difficulty" in the areas of using public transportation, initiating and participating in activities independently, keeping appointments, communicating clearly and effectively, making and getting along with friends, getting along with strangers, getting along with others, exhibiting social maturity, avoiding social isolation, and interacting and actively participating in group activities.  (R. 277-78.)  He further noted that claimant "has a long history of school avoidance/phobia.  He experiences debilitating anxiety.  He avoids almost all social situations [with] strangers."  (R. 278.)  However, Dr. Sucich admits to having had limited experience with claimant, and he further notes that his report is based mostly on medical records.  (R. 279.)

Finally, on August 30, 2005, Dr. Sucich, in response to a request from claimant's attorney, supplemented his assessment as follows: "I believe [claimant] would have tremendous difficulty in any work setting at this time.  His level of anxiety and social withdrawal is severe. It is unlikely that he could perform even simple tasks, deal with coworkers, or receive instructions from supervisors.  Traveling by public transportation to and from a work site appears beyond him at this point."  (R. 283.)

I.      **Administrative Proceedings**

Ojeda filed a claim for Supplemental Security Income Disability benefits on behalf of the

then-minor claimant on December 19, 2003.  (R. 71.)  This claim was first denied by a notice dated May 7, 2004.  (R. 73-76.)  Ojeda appealed, and on August 24, 2005, claimant and Ojeda appeared with counsel at a hearing before Administrative Law Judge Newton Greenberg ("ALJ Greenberg").  (R. 42-70.)  Because claimant reached age eighteen prior to the hearing, his proceeding before the ALJ involved the application of the standards for determining whether or not one is "disabled" both as a child and as an adult.

At the Administrative hearing, claimant testified that he thinks he could do a building or maintenance job despite having no past relevant work experience.  (R. 46.)  Elsewhere in the record it is established that he often helped his father work on cars in his garage.  (R. 102.)  He testified that he had been home schooled for about a year because he had been nervous about going to school as the result of a fight and that he had not wanted to go anymore.  (R 48-49.)  He added that he had taken medication, but that he was not currently taking any despite Dr. Sucich's recommendation.  (R. 49-50.)  He testified that he gets nervous about everything, especially being around people, and that he does not have any friends.  (R. 50-51.)  He further testified that, if given proper instructions, he could take public transportation by himself, though he has not done so.  (R. 53.)  Claimant then testified that he would be nervous receiving instructions from a boss.  (R. 55-56.)  He also testified that he often has trouble sleeping at night.  (R. 58.)

After claimant was finished, Ojeda gave her testimony.  She testified that she didn't think that claimant could have a job, because "he's afraid to go outside, he's afraid to see people, afraid to go on a bus or a train, he can't relate to people."  (R. 61.)  However, elsewhere in the record it is established that claimant does go outside every day and can do so alone.  (R. 100.)  She also testified that he can handle bathing and dressing himself.  (R. 62.)  She further testified

that he has never had a girlfriend but would like one. (R. 62-63.)

On October 6, 2005, ALJ Greenberg issued a Notice of Decision denying the claimed benefits. (R. 21-32.) Claimant then attempted to gain review of the ALJ decision by the Appeals Council. On March, 26, 2006, by Action of Appeals Council on Request for Review, the Appeals Council denied review and thereby rendered ALJ Greenberg's decision the final decision of the Commissioner with respect to claimant's application for disability benefits. (R. 7-10.) Ojeda then timely filed this action on claimant's behalf in this Court on May 17, 2006.

**II.      Discussion**

A.      Standard of Review

"In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law." Melville v. Apfel, 198 F.3d 45, 51-52 (2d Cir. 1999) (citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) and Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In making this determination, the reviewing court is to defer to the ALJ's resolutions of conflicting evidence. See Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998) ("In reviewing the denial of SSI benefits, we must determine whether the SSA's decision was supported by substantial evidence and based on the proper legal standard, keeping in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record."). Additionally, the reviewing court is not to engage in an independent analysis of the claim for

benefits at issue.  See Melville, 198 F.3d at 52 ("It is not the function of the reviewing court to decide *de novo* whether a claimant was disabled . . . or to answer in the first instance the inquiries posed by the five step analysis set out in the SSA regulations.").  With these standards in mind, the Court will address the instant claims for childhood and adult benefits in turn.

B.      The Childhood Disability Claim

The definition of "disabled" as applied to a child is provided in the Social Security Act: "An individual under the age of 18 shall be considered disabled for the purpose of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The Act further provides that "no individual under the age of 18 who engages in substantial gainful activity . . . may be considered to be disabled."  42 U.S.C. § 1382c(a)(3)(C)(ii).

The Commissioner engages in a three step analysis when applying this standard.  First, the Commissioner considers whether or not the child is currently engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  If not, the Commissioner next considers whether the child's impairment is "severe" and significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 416.924(c).  Finally, if the child has a severe impairment, the third inquiry is whether that impairment meets, medically equals, or functionally equals the criteria for an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924(d).

Pursuant to step three, in cases where the impairment does not meet or medically equal the listed criteria, the Commissioner determines if the impairment functionally equals that

criteria by evaluating six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i-vi). A severe impairment functionally equals a listed impairment if the analysis results in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

Extreme limitations occur when an impairment interferes very seriously with a child's ability to independently initiate, sustain, or complete activities. They are the equivalent of functioning found on standardized testing at scores of at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3). Marked limitations exist when the impairment interferes seriously with one's ability to independently initiate, sustain, or complete activities. They are the equivalent of functioning found on standardized testing at scores at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2). "For a child to have a marked or extreme limitation in a particular domain, not all activities or functions encompassed by the domain need be impaired." McClain v. Barnhart, 299 F. Supp. 2d 309, 315 (S.D.N.Y. 2004).

In this case, ALJ Greenberg first found that claimant has never engaged in any substantial gainful activity. (R. 24.) Second, he concluded that claimant "has medically determinable 'severe' impairments with a generalized anxiety disorder, obesity, asthma, learning disorder and low average intellectual functioning." (R. 25.) He then reached the third step in the analysis, where he determined that claimant's limitations did not meet or medically equal any of the listed impairments. (R. 25.) Accordingly, consideration of the aforementioned six domains

was necessary to determine whether claimant's impairments were functionally equal to the listed impairments. ALJ Greenberg concluded that they were not, finding one marked limitation—in the domain of interacting and relating with others—but either less than marked limitations or no limitations in the other domains. (R. 26-28.) Notably, with respect to the "acquiring and using information" domain, he wrote: "This domain considers how well the child acquires or learns information, and how well the child uses information learned. In this domain, the child has less than 'marked' limitations. He was in special education and later provided home schooling. It [sic] is literate in the English language, has had limited academic achievement as show [sic] in his school work and standardized testing, and has IQ test scores at the low edge of low average." (R. 26.) Because claimant's impairment was not found to be the functional equivalent of a listed impairment, his claim for childhood benefits was denied. (R. 28.)

Neither party disputes ALJ Greenberg's conclusions at the first two steps of the analysis. Nor does either party dispute his conclusion that claimant has a marked limitation in the domain of interacting and relating to others, or that there are less than marked limitations in the domains of attending and completing tasks, moving about and manipulating objects, caring for oneself, and health and physical well-being. Rather, both parties contend that ALJ Greenberg erred with respect to the acquiring and using information domain. Claimant argues that he has a marked limitation in this domain and therefore that he should be found disabled and his claim should be remanded solely for the calculation of benefits. (Pl's Br. at 16-18.) Defendant argues that this case should be remanded for further proceedings because ALJ Greenberg failed to consider certain evidence relevant to this domain. For the reasons set forth below, the Court agrees with the defendant and remands the childhood disability claim for further proceedings.

Claimant relies primarily on two key facts in arguing for a finding of "disabled." First, he notes that his score on the verbal reasoning portion of the Stanford Binet test was 64, which is more than two, but less than three, standard deviations below the mean. (Pl's Br. at 17-18.) Second, he points to the questionnaire filled out by his teacher and a school psychiatrist in September of 2003, which, as noted above, indicates the existence of several "obvious problems" and "serious problems" and one "very serious problem" with respect to topics falling within this domain.[3] (Def's Br. at 18.) Claimant then concludes that "[t]aken together with the marked limitation in interacting and relating, [claimant] is clearly disabled under the child SSI disability standard." Id. Similarly, in arguing for remand for further proceedings, defendant notes that ALJ Greenberg "did not consider [claimant's] score on the verbal reasoning component" of the Stanford Binet test, and that the case should therefore be remanded to allow him to determine "whether this test score, in combination with other information in the record, showed that [claimant's] functioning in day-to-day activities was seriously or very seriously limited by his impairment." (Def's Br. at 15.) However, defendant then goes on to argue that the evidence in the record, on balance, does not warrant a finding of disabled and a remand solely for a determination of benefits. Id. at 16-17.

Remand solely for the calculation of benefits is appropriate only if the record compels a conclusion of disabled. See Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998); Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Cruz v. Barnhart, 343 F. Supp. 2d 218, 222 (S.D.N.Y. 2004) (declining to remand solely for the calculation of benefits because "this is not a case in

---

[3]Though claimant indicates in his brief that this form was filled out in March of 2004, it appears from the record that it was actually done on September 5, 2003. (R. 189.)

which the 'record . . . compel[s] but one conclusion.'" (quoting Johnson) (alterations in original)). "Such a remand solely for the calculation of benefits is an extraordinary action and is proper only when further development of the record would serve no purpose." Rivera v. Barnhart, 423 F. Supp. 2d 271, 279 (S.D.N.Y. 2006) (internal quotations omitted). In this case, the Stanford Binet composite score of 80 indicates average (albeit low average) overall intelligence—and therefore only a moderate weakness in the overall learning rate. (R. 26, 124; Def's Br. at 16.) Moreover, the test indicated relative strengths in visual and mathematical modes of reasoning. (R. 124.) Additionally, Dr. Charles concluded that claimant did not have a "marked" limitation in this domain (R. 270), and Dr. Palmiery observed that he had no cognitive defects. (R. 118.) In light of this evidence, the record in this case does not compel a finding that the claimant is disabled.

Although remand solely for the calculation of benefits is not appropriate in this case, remand for further administrative proceedings is. Pursuant to the fourth sentence of 42 U.S.C. § 405 (g), the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "In deciding whether the ALJ's decision was based on substantial evidence, a reviewing court must determine whether the ALJ complied with his affirmative duty to develop fully the administrative record." Rivera v. Barnhart, 423 F. Supp. 2d 271, 277 (S.D.N.Y. 2006); see also Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). In addition, the ALJ has a duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Lopez v. Sec'y of the Dep't of Health and Human Servs., 728 F.2d 148, 151 (2d Cir. 1984)

(quoting Gold v. Sec'y of H.E.W., 563 F.2d 38, 43 (2d Cir. 1972)).  Therefore, the Second

Circuit has held that it is proper to remand cases "when it appears that the ALJ has failed to

consider relevant and probative evidence which is available to him."  Lopez, 728 F.2d at 150-51.


Here, in light of the fact that the controlling law does not require that a claimant have

defects in all areas of a relevant domain, the Court agrees with both parties that ALJ Greenberg

erred by failing to expressly consider the significance of the Stanford Binet score of 64 in the

area of verbal reasoning.[4]  Moreover, ALJ Greenberg did not address the September 2003

questionnaire filled out by claimant's teacher indicating several obvious, serious, and very

serious problems within the acquiring and using information domain.  Therefore, the Court

vacates the decision of ALJ Greenberg as to the claim for childhood benefits and remands for

further proceedings.  On remand, ALJ Greenberg is directed to explicitly address the impact of

these two pieces of evidence and weigh them against the contrary evidence cited above in

determining whether or not there is at least a marked limitation in the domain of acquiring and

using information.

### C.    The Adult Disability Claim

In order to qualify for benefits as an adult, a claimant first must meet the income and

resource limitations of 42 U.S.C. §§ 1382a and 1382b.  Then, the claimant must demonstrate an

inability "to engage in any substantial gainful activity by reason of any medically determinable

---

[4]Moreover, as claimant correctly points out, it seems that Dr. Charles considered only the composite score of 80, and not the 64 in verbal reasoning, in reaching his conclusion.  Therefore, it appears that Dr. Charles' conclusion suffers from the same defect as ALJ Greenberg's.  (Pl's Reply at 3-4.)

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, the impairment must be of such severity that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five step analysis when confronted with an adult disability claim. First, the Commissioner considers whether or not the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, the Commissioner next considers whether the claimant has a "severe" impairment. Id. at (a)(4)(ii). Third, if the impairment is severe, the Commissioner considers whether or not the claimant has an impairment which meets or equals the listings. If so, the claimant is disabled and the inquiry ends. Id. at (a)(4)(iii). Next, if the impairment does not meet or equal the listings, the Commissioner considers whether or not the claimant has the residual functional capacity[5] to do his past relevant work.[6] Id. at (a)(4)(iv). Fifth and finally, if the claimant can not do any past relevant work, the Commissioner determines whether, based on residual functional capacity as well as age, education, and work experience, the claimant could do other work.[7] Id. at (a)(4)(v).

---

[5]Residual functional capacity is the most one can still do despite their limitations. 20 C.F.R. § 416.945(a)(1).

[6]The claimant bears the burden of proving that he cannot return to his former line of work. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

[7]At the fifth step in the analysis, the burden falls on the commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (citing Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) and Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)).

At the fifth step, the Commissioner can at times satisfy his burden by resorting to the applicable medical vocational guidelines ("the grids"), found at 20 C.F.R. Part. 404, Appendix. 2 (1986). See Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999). "The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy." Id. (internal quotations and citation omitted). The grids are dispositive in cases where a claimant suffers exclusively from exertional impairments.[8] See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, where other, non-exertional impairments are present, reliance on the grids becomes more suspect. First, a claimant might suffer from both exertional limitations and non-exertional limitations. In this situation, the grids "cannot provide the exclusive framework for making a disability determination." Bapp, 802 F.2d at 605. Rather, in these cases, the courts should first utilize the grid to determine what jobs the claimant could do based only on the exertional limitations, then determine what effect the non-exertional limitations have on this conclusion by giving full consideration to all relevant facts in accord with the appropriate sections of the regulations. See Id. As the Bapp court pointed out, the applicable regulations make this quite clear:

> [W]here an individual has an impairment or combination of impairments resulting in *both strength limitations and non-exertional limitations*, the [grids] are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the

---

[8]"Exertional" limitations are limitations related to strength. Rosa, 168 F.3d at 82. Non-exertional limitations are all limitations that are not considered exertional.

individual's maximum residual strength capabilities, age, education, and work experience *provide a framework for consideration of how much the individual's work capability is further diminished* in terms of any types of jobs that would be contraindicated by the non-exertional limitations.  Also, in these combinations of non-exertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full *consideration must* be given to all of *the relevant facts in the case* in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.'"

Bapp, 802 F.2d at 604 (quoting 20 C.F.R., Plaintiff. 404, Subpt. P, App. 2 § 200.00(e)(2)) (internal quotations omitted) (emphasis in original).  If the non-exertional limitations are significant, then the ALJ may not rely exclusively on the result indicated by the grids solely with respect to the exertional limitations, rather, he must obtain the testimony of a vocational expert or other similar evidence to determine what effect the non-exertional limitations have on the claimant's ability to work in the national economy.  Rosa, 168 F.3d at 82 ("Where significant non-exertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' . . .  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the national economy which claimant can obtain and perform.'" (quoting Bapp, 802 F.2d at 603, 605-06)); see also Iannopollo v. Barnhart, 280 F. Supp. 2d 41, 50-51 (W.D.N.Y. 2003) (remanding for the testimony of a vocational expert in a case involving both exertional and non-exertional limitations to determine what jobs within the "sedentary" range could be performed by claimant in light of additional non-exertional limitations).

Although relevant in the case of a claimant with both exertional and non exertional impairments, "the grids only account for [the] exertional limitations."  Sergenton v. Barnhart, 470 F. Supp. 2d 194, 202 (E.D.N.Y. 2007).  Therefore, they are only relevant in mixed cases by

virtue of the first step in the <u>Bapp</u> procedure outlined above and applied in those cases—that is, the presence and analysis of the exertional limitations. By contrast, where a claimant suffers solely from non-exertional impairments, application of the grids is inappropriate. <u>Baker v. Apfel</u>, No. 97-CV-757H, 1998 WL 683773 at *4 (W.D.N.Y. Aug. 10, 1998) ("In contrast to the claimant in <u>Bapp</u>, plaintiff in this case suffers from only non-exertional impairments. Accordingly, application of the grids was inappropriate."); <u>Peterson v. Sec'y of Health and Human Servs.</u>, No. 89-CV-1019, 1990 WL 164699 at *4 (N.D.N.Y. Oct. 15, 1990) ("[T]he regulations state that the grid may not be applied where an individual suffers from solely non-exertional impairments or where there is a significant non-exertional impairment."). The court in <u>Ortiz v. Shalala</u>, No. 93 CIV. 4501 (WK), 1994 WL 481921 at *3 (S.D.N.Y. Sept. 2, 1994) explained:

> In contrast to the claimant in <u>Bapp</u>, plaintiff's impairments—migraine headaches and anxiety—are solely non-exertional in nature. We read the <u>Bapp</u> decision as holding that the guidelines are only applicable in cases where a claimant suffers exertional limitations which are accompanied, if at all, by insignificant non-exertional impairments. Thus, under <u>Bapp</u>, the guidelines are never applicable where a claimant such as plaintiff suffers only from non-exertional impairments. Accordingly, the ALJ should have required the Secretary to meet her burden of establishing plaintiff's ability to find employment without using the medical-vocational guidelines.

Rather, "where the individual has solely a non-exertional type of impairment, determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations." <u>Cosgrove v. Barnhart</u>, No. 01 Civ. 2632(LTS), 2004 WL 1171772 at *5 (S.D.N.Y. May 6, 2004) (internal quotations omitted); <u>Sergenton</u>, 470 F. Supp. 2d at 202 ("The regulations specifically direct that, where the individual has solely a non-exertional type of impairment, determination as to whether disability exists shall be based on the principles in the appropriate

sections of the regulations."); see also SSR 85-15, 1885 WL 56857 at *1 (1985) ("[W]here a person has solely a non-exertional impairment(s), the table rules do not direct conclusions of disabled or not disabled. Conclusions must, instead, be based on the principles in the appropriate sections of the regulations.").

The Social Security Administration has issued a policy statement providing guidance in the absence of the applicability of the grids. Where a claimant suffers from purely non-exertional limitations, "the [residual functional capacity] reflecting the severity of the particular non-exertional impairment(s) with its limiting effects on the broad world of work is the first issue. The individual's relative advantages or adversities in terms of age, education, and work experience is the second." SSR 85-15, 1985 WL 56857 at *2 (1985). With respect to the first issue—the severity of the impairment and the resulting residual functional capacity—the Second Circuit has directed that a vocational expert or other similar evidence is necessary to determine whether or not there exist a significant number of jobs within the national economy that the claimant could perform in light if his limitations. See Rosa, 168 F.3d at 82; Sergenton, 470 F. Supp. 2d at 202 ("When evaluating significant non-external impairments that limit the range of sedentary work that the claimant can perform, sole reliance on the grid is inappropriate. Instead, a vocational expert is necessary to assess the claimant's residual functional capacity for meaningful employment opportunities."); Fine v. Sullivan, No. 88 CIV. 7223 (JFK), 1990 WL 96993 at *7 (S.D.N.Y. July 3, 1990) ("The Second Circuit has directed that in the presence of a significant non-exertional impairment, vocational expert testimony is necessary.").

In this case, ALJ Greenberg concluded that claimant was not engaged in substantial work activity, that his impairments are severe, that his impairments do not meet or medically equal the

listed impairments, and that he did not engage in any past relevant work.  (R. 28-29.)

Accordingly, he reached step five.  At step five he concluded that "claimant retains the residual

functional capacity for non-complex not highly stressful, unskilled work, in a relatively

temperate and unpolluted work environment."  (R. 29.)  He then noted that the grids "do not

direct a conclusion of 'disabled' or not 'disabled' if the claimant's residual functional capacity

consists only of non-exertional limitations."[9]  (R. 30.)  He further asserted that "[i]f the adult

claimant's non-exertional limitations do not significantly compromise his ability to perform

work at all exertional levels, [the grids] indicate[] that a finding of not 'disabled' would be

appropriate."  (R. 30.)  He then determined that claimant's non-exertional limitations did not

"significantly compromise" his ability to work "at all exertional levels."  (R. 30.)  Finally, he

concluded that claimant was not disabled "using Section 204.00 of the Medical-Vocational

Guidelines as a framework for decisionmaking."  (R.30.)

Claimant argues that ALJ Greenberg both incorrectly stated the applicable law and

incorrectly concluded that claimant's non-exertional limitations are insignificant.  (Pl's Reply at

6-9.)  The Court agrees.  First, the Court holds that ALJ Greenberg's conclusion that claimant's

limitations are not significant is not supported by substantial evidence.  The record makes

abundantly clear that claimant's mood and anxiety disorders result in significant impairments.

Moreover, ALJ Greenberg himself held that these impairments were "severe" at the second step

in the analysis.  The Court suspects that his conclusion at step five resulted from the erroneous

consideration of the law that applies only to claims involving impairments that are both

_____

[9]ALJ Greenberg seems to have correctly assumed that this is a case involving purely non-exertional limitations.  Neither party challenges this assumption.

exertional and non-exertional. In those cases, the exertional impairments might be "severe" for the purposes of the second part of the analysis—even if the non-exertional impairments in that case are not. Then at step five, by application of the grids, the exertional impairments might dictate a finding that claimant could do jobs classified as, for instance, "sedentary." In circumstances like those, the courts have indicated that the non-exertional impairments need only disturb that conclusion if they are said to be "significant." See Bapp, at 605. If they are insignificant, they do not further limit the clamant's job options in the step five analysis and the conclusion of not disabled based on the grids remains.[10] However, in a case where non-exertional impairments are not coupled with exertional impairments, the Court fails to see, for all practical purposes, how it would be possible for the same limitations to be considered "severe" at step two and yet "insignificant" at step five, as ALJ Greenberg seems to have concluded.

Moreover, with respect to the law, as is made clear above, in a case involving purely non-exertional limitations that are arguably significant, reliance on the grids in the absence of the testimony of a vocational expert or other similar evidence is inappropriate. ALJ Greenberg seems to have reached his conclusion by applying the grids, noting that there are no exertional limitations whatsoever—and therefore that claimant could do any job listed on the grids absent further limitation—and then incorrectly asserting that claimant's "severe" non-exertional limitations are insignificant. Cases have held that application of the grids in lieu of the testimony of a vocational expert (or other similar evidence) in a purely non-exertional situation

---

[10]As is noted above, if they are significant, the ALJ is to determine the final residual functional capacity by taking the result dictated by the grids and determining how much the non-exertional limitations further reduce the claimant's ability to work in the national economy—utilizing the testimony of a vocational expert or other similar evidence. Rosa 168 F.3d at 82.

is grounds for remand.  See, e.g., Rivas v. Barnhart, No. 01 Civ. 3672 RWS, 2005 WL 183139 at

*25-27 (S.D.N.Y. Jan. 25, 2005) (finding application of the grid in a non-exertional limitation

case to be legal error on the part of the ALJ); Baker v. Apfel, No. 97-CV-757H, 1998 WL

683773 at *4-5 (W.D.N.Y. Aug. 10, 1998) (remanding case where ALJ utilized the grid rather

than the testimony of a vocational expert in a non-exertional impairments case).

 However, claimant again argues—as he did with respect to his childhood claim—that he

should be found by this Court to be disabled as an adult and that his claim should be remanded

solely for the calculation of benefits.  (Pl's Br. at 21-25.)  He relies on the report and subsequent

supplemental letter by Dr. Sucich and the findings of Dr. Charles regarding interpersonal

anxiety, his inability to take public transportation, and the conclusion that claimant could not

perform simple tasks, deal with co-workers, or receive instructions from supervisors.  As is

noted above, remand solely for the calculation of benefits is only appropriate where the record

compels a conclusion of "disabled."  Johnson, 817 F.2d at 983 ("[W]here the application of the

correct legal principles could lead to only one conclusion, there is no need to require agency

reconsideration.").  In this case, the record does not compel the conclusion that claimant is

"disabled" as an adult.  In addition to the evidence he cites, there is counter-evidence in the

record that shows that claimant is of "low average" intelligence, that his teacher concluded that

he had no problems carrying out simple instructions and only a slight problem focusing long

enough to finish assigned tasks (R. 191), that his memory, concentration, and attention are good

(R. 118), and that he has only moderate difficulty in occupational functioning (R. 275.)

Moreover, there is evidence in the record that he can go outside alone (R. 100), would be able to

travel by public transportation if properly instructed (R. 53), could do manual labor (R. 46), and

has helped his father repair cars.  (R. 102.)  Moreover, there is no evidence in the record (only ALJ Greenberg's conclusory assertion) that suggests what jobs within the national economy the claimant could perform in light of his limitations—like the testimony of a vocational expert. Therefore the Court holds that the "extraordinary action" of remand solely for the calculation of benefits is inappropriate in this case.  Accordingly, ALJ Greenberg's decision with respect to the claim for adult benefits is vacated and remanded for further administrative proceedings.

### III.     Conclusion

The decision of the Commissioner is vacated and remanded for further proceedings consistent with this opinion.  More particularly, with respect to the claim for childhood benefits, the ALJ is directed to explicitly weigh and discuss the pieces of evidence identified herein that were not explicitly considered in his October 6, 2005 decision.  With respect to the claim for adult benefits, the ALJ is directed to obtain the testimony of a vocational expert or other comparable evidence to help determine what jobs within the national economy the claimant could currently perform, further taking into account his age, education, and (lack of) work experience.

SO ORDERED.

Dated:  Brooklyn, NY
            October 29, 2007

Carol Bagley Amon
United States District Judge